DS124818

SEALED

ORIGINAL

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

2020 JUN 23  PM 1: 13

DEPUTY CLERK_____

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF TEXAS *ex rel.* Amber Faulkner, and AMBER FAULKNER, individually,<br><br>    Plaintiffs,<br>    v.<br><br>METHODIST CHARLTON MEDICAL CENTER, and DAN JONES, D.P.M.,<br><br>    Defendants. | 3-20CV1663-X<br><br>CASE NO.<br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)<br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff and *qui tam* Relator Amber Faulkner ("Relator"), by and through her undersigned counsel Brown, LLC and Dean Omar Branham Shirley, LLP, alleges of personal knowledge as to her observations and actions, and on information and belief as to all else, as follows:

## I.
## PRELIMINARY STATEMENT

1.    Defendant Dan Jones, D.P.M. ("Jones") knowingly endangered Medicare and Texas Medicaid beneficiaries by performing medically unnecessary and contraindicated skin graft surgeries that led to worsened patient outcomes, including amputation.

2.    Without swift intervention from the government, patients remain at risk for horrific medical consequences.

3.    Jones billed and received payments from Medicare and Texas Medicaid for his medically unnecessary surgeries.

4.    Defendant Methodist Charlton Medical Center ("Methodist"), where Jones performed many of his surgeries, was aware of and received insurance payments from Jones's

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

scheme. Nevertheless, Methodist did not reimburse Medicare or Texas Medicaid for the monies it received as a result of Jones's fraudulent operations.

5.      Relator thus brings this *qui tam* action on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA") to recover treble the damages sustained by, and civil penalties and restitution owed to, the United States as a result of Defendants' fraud.

6.      Relator also brings this *qui tam* action on behalf of the State of Texas under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 *et seq.* (the "TMFPA"), to recover treble the damages sustained by, and civil penalties owed to, Texas as a result of Defendants' fraud.

7.      This Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2). It will not be served on Defendants unless and until the Court so orders. A copy of the Complaint, along with written disclosure of substantially all material evidence and information that Relator possesses, has been served upon the Attorney General of the United States and on the United States Attorney for the Northern District of Texas pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4(d), and on the Attorney General of Texas, pursuant to Tex. Hum. Res. Code §36.102.

## II.
## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action is brought for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, a federal statute. In addition, this Court has jurisdiction over the State claims pursuant to 31 U.S.C. § 3732(b).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

9.      The Court has personal jurisdiction over Defendants because Defendants (a) are residents of, and/or are licensed to transact and do transact business in, this District; and (b) have carried out their fraudulent scheme in this District.

10.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 (b)(2), because Defendants can be found in, and transact or have transacted business in this District, and the events and omissions that give rise to these claims have occurred in this District.

11.     The original Complaint was filed within the time period prescribed by 31 U.S.C. § 3731(b), Tex. Hum. Res. Code §§ 36.104, 36.115, and 29 U.S.C. § 255.

### III.
### NO PUBLIC DISCLOSURE;
### MATERIAL AND INDEPENDENT INFORMATION
### REGARDING VIOLATIONS OF THE FALSE CLAIMS ACT

12.     Relator makes the allegations in this Complaint based on her own knowledge, experience and observations.

13.     Relator is the original source of the information on which the allegations herein are based, and voluntarily disclosed such information to the United States and Texas before filing this action.

14.     There has been no public disclosure, relevant under 31 U.S.C. § 3730(e) or Tex. Hum. Res. Code § 36.113(b), of the "allegations or transactions" in this Complaint. Alternatively, to the extent that any such public disclosure has been made, Relator possesses information that is independent of and materially adds to any allegations that may have been publicly disclosed.

3

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## IV.
## THE PARTIES

### A.    The United States

15.    Plaintiff the United States brings this action by and through Relator. At all times relevant to this Complaint, the United States, acting through the Centers for Medicare & Medicaid Services ("CMS"), has reimbursed Defendants for the provision of health services, including surgeries.

### B.    Plaintiff the State of Texas

16.    Realtor also brings this action on behalf of Plaintiff the State of Texas. At all times relevant to this Complaint, Texas, acting through the Texas Health and Human Services Commission (the "THHSC"), has reimbursed Defendants for the provision of health services, including surgeries.

### C.    Relator

17.    Relator Amber Faulkner ("Relator") is a citizen of the United States, and a resident of Dallas County, Texas. Faulkner has been consulting at Methodist as a wound care physician assistant since approximately 2015.

### D.    Defendants

18.    Defendant Methodist Charlton Medical Center ("Methodist") has its principal place of business at 3500 West Wheatland Road, Dallas, Texas 75237.

19.    Defendant Dan Jones, D.P.M. ("Jones") is a podiatrist. Jones has practiced at Methodist since at least 2014. In addition, Jones also practices at Comfort Podiatry Group, located at 3430 West Wheatland Road, Suite 104, Dallas, Texas 75237.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## V.
## DEFENDANTS' FRAUD

Coverage for Skin Grafts

20.    Medicare coverage for bioengineered skin substitutes is determined by each regional Medicare Administrative Contractor ("MAC")[1] through its Local Coverage Determinations ("LCD"). The MAC for Jurisdiction JH, which encompasses Texas, is Novitas Solutions, Inc. ("Novitas"). Jurisdiction JH's LCD for skin grafts, numbered L35041, is attached as **Exhibit A**.

21.    When a chronic wound is unable to heal, grafting a skin substitute onto the wound may assist in the natural regrowth of skin over the wound.

22.    Accordingly, Medicare covers skin grafts for lower extremity wounds, including diabetic foot ulcers ("DFU"), that have failed to respond to documented conservative[2] wound care measures for greater than four weeks. *See* Exhibit A, at 8.

23.    Skin grafts are contraindicated, and thus not medically necessary and reasonable, when the patient has underlying conditions such as uncontrolled diabetes and active infections. *Id.*, at 9.

Jones Reflexively Performed Inappropriate Skin Graft Surgeries

24.    Jones has practiced at Methodist since at least 2014. Since approximately 2018, Jones has acted as Methodist's head podiatrist.

---

[1] A MAC is a private insurer awarded a geographic jurisdiction to process medical claims for Medicare beneficiaries. MAC jurisdictions can be found at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/Downloads/AB-Jurisdiction-Map-Jun-2019.pdf (last accessed Feb. 24, 2020).
[2] Conservative wound treatment refers to non-surgical therapy, such as compression, wound dressing, and management of dietary and smoking habits.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

25.     For almost all patients suffering from DFUs and other lower extremity chronic wounds, Jones's treatment plan was essentially the same, consisting of the following steps in a single procedure:

  a) Incision and drainage of the wound;
  b) Debridement, or tissue removal, of infected and/or necrotic areas; and
  c) Grafting a skin substitute.

26.     Jones performed skin grafting procedures for such patients despite knowing that the underlying conditions of diabetes and/or infection were not under control. Medicare considers such skin grafts to be contraindicated and not medically necessary and reasonable.

27.     As a result, most of such surgeries ended in skin graft failure and continued infection and/or necrosis of the wound. In multiple cases, the patient would later require a foot or below-the-knee amputation.

28.     Despite repeated and consistent failures, Jones continued to apply skin grafts when they are contraindicated – and to bill such surgeries to government payers.

29.     Among podiatrists nationwide, Jones ranks among the most prolific users of skin substitutes.

30.     For instance, in 2017 Jones ranked third among all podiatrists for the units of skin substitutes billed to Medicare. Specifically, Jones billed for 9,387 square centimeters of Dermagraft, a brand of skin substitute, at a total reimbursement value of approximately $241,784.[3]

31.     In 2017, Jones billed Medicare for approximately 28.27 square centimeters of skin substitute per distinct patient visit, compared with the national podiatrist average of approximately

---

[3] This analysis uses information from the CMS database Medicare Provider Utilization and Payment Data: Physicians and Other Supplier PUF CY2017, *available at* https://tinyurl.com/y95ujudj (last accessed June 22, 2020). Jones billed for Dermagraft using Healthcare Common Procedure Coding System ("HCPCS") code Q4106. Competing skin substitutes are billed using codes Q4100 through Q4226.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

0.03.[4] In other words, Jones billed for skin substitutes at a rate that is approximately 942 times the national average for a podiatrist.

<u>Methodist Has Knowledge of Jones's Fraud</u>

32.    Relator and other Methodist practitioners have complained to Methodist management about Jones's dangerous and fraudulent procedures.

33.    Due to his malpractice, Jones has become a target of derision from his colleagues at Methodist. On June 10, 2020, Basit Ali, D.O. sent a text message to individuals including Relator stating that, for an operation on Texas Medicaid beneficiary "Bravo", "as usual [Jones] used one of his tissue grafts which will necrose as usual in a few days."

34.    In response, Ronak Patel, D.O. suggested that Jones's fraud has been ongoing for years, writing: "So 6 years have not changed anything? Is reprogramming possible?" Ali replied, "Don't think so but whistle blowing can work."

35.    The next day, Ali documented in Bravo's progress notes as follows: "tissue graft placement – failed, wound necrotic with purulence next day on 6/11/20. Odor profound . . . High risk BKA [below-knee-amputation.]" On information and belief, Bravo has since received a recommendation for BKA from another surgeon.

36.    On or about June 17, 2020, Methodist wound care program director Donna Joiner told Relator words to the effect that Methodist management has long been aware that Jones performed fraudulent procedures.

37.    As of the filing of this Complaint, Methodist has not refunded Medicare or Texas Medicaid for any of the monies it received as a result of Jones's fraud.

---

[4] These statistics are derived using the same database, by dividing the "Number of Services" column for skin substitute codes by the "Number of Distinct Medicare Beneficiary/Per Day Services" column for patient visit codes. Patient visit codes are 99201 to 99205 for new patients, and 99211 to 99215 for established patients.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## VI.
## THE LEGAL FRAMEWORK

### A.    The False Claims Act

38.    The False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, (the "FCA"), reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability for an individual or entity that:

> (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim....

31 U.S.C. § 3729(a)(1).

39.    "Knowing," within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference. *Id.* § 3729(b)(1).

40.    The FCA defines "claim" to include any request for money that:

> is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>
> (I)    provides or has provided any portion of the money or property requested or demanded; or
>
> (II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded....

*Id.* § 3729(b)(2)(A)(ii). Thus, the United States has a cause of action under the FCA for fraud upon the Medicaid program.[5]

---

[5] *See, e.g., Hays v. Hoffman*, 325 F.3d 982, 988 (8th Cir. 2003) ("When Congress amended the FCA in 1986, it defined 'claim' to include requests for money made to grantees of the federal government. The legislative history explained this was done to clarify that false claims for FCA purposes include claims submitted to state agencies under the Medicaid program and other State, local, or private programs funded in part by the United States where there is

8

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

41.    For each false claim or other FCA violation, the FCA provides for the assessment of treble damages, plus a civil penalty.[6]

42.    The FCA provides for payment of a percentage of the United States' recovery to a private individual who brings suit on behalf of the United States (the "Relator") under the FCA. *See* 31 U.S.C. § 3730(d).

**B.    The Medicare Program**

Program Overview and Provider Enrollment

43.    In 1965 Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for certain healthcare services provided to certain segments of the population. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395 *et seq.*

44.    The federal Department of Health and Human Services, through CMS, administers the Medicare program.

45.    CMS enters into agreements with healthcare providers such as Defendants to establish their eligibility to participate in the Medicare program. Individuals or entities who are participating providers in Medicare may seek reimbursement from CMS for services rendered to patients who are program beneficiaries.

---

significant Federal regulation and involvement.") (internal citation and quotation marks omitted; citing S. REP. NO. 99-345 at 22, 1986 U.S.C.C.A.N. at 5287); *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 396 (S.D.N.Y. 2015) ("Congress has repeatedly and specifically provided that claims submitted to Medicaid constitute false claims for the purposes of the FCA.") (citing, *inter alia*, S. Rep. No. 111-10, at 11, 2009 U.S.C.C.A.N. 438, explaining that the 2009 Fraud Enforcement and Recovery Act clarified that "the FCA reaches all false claims submitted to State administered Medicaid programs.").

[6] 31 U.S.C. § 3729(a)(1)(G) provides a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410). The Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. 2461 note, substituted a different statutory formula for calculating inflation adjustments on an annual basis. On January 29, 2018, the Department of Justice promulgated a Final Rule increasing the penalty for FCA violations occurring after November 2, 2015. For such penalties assessed after January 29, 2018, the minimum penalty is $11,181 and the maximum is $22,363. *See* 28 C.F.R. § 85.5; 82 F.R. 3944 (Jan. 29, 2018).

9

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

46.     To enroll as an authorized participant in Medicare, a hospital is required to make the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Medicare Enrollment Application: Institutional Providers, CMS-855A, at 48.[7]

47.     Individual providers such as Defendant Jones enroll in Medicare using the form CMS-855I, or through the online Provider Enrollment, Chain and Ownership System ("PECOS"). CMS-855I contains a certification substantially similar to that in CMS-855A. *See* Medicare Enrollment Application: Physicians and Non-Physician Practitioners, CMS-855I, at 25.[8]

48.     Compliance with applicable Medicare program rules and regulations is material to the government's decision to pay and its subsequent payment of claims. In order to be reimbursable by Medicare, services must be medically necessary, must actually be provided, and must be documented in a manner that allows CMS to determine if the services are properly payable.

The Medicare Claims Process

49.     In order to receive reimbursement from Medicare, providers such as Defendants must submit a claim form. *See* Form CMS-1500.[9] That claim form requires the provider to make the following certification:

---

[7] *Available* at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf (last accessed June 17, 2020).

[8] *Available* at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf (last accessed June 17, 2020).

[9] *Available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf (last accessed June 17, 2020).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete ... 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment [and] ... 5) the services on this form were **medically necessary** ....

*Id.*, at 2 (emphasis added).

50.     A provider may also submit the electronic equivalent of this claim form, which contains a substantially similar certification.

51.     CMS guidance as to electronic claims submission is found in Chapter 24 of the Medicare Claims Processing Manual, CMS Publication No. 100-04 (the "Claims Manual").[10] Among other things, the guidance specifies the minimum content of the enrollment form that a local Medicare Administrative Contractor or "MAC"[11] may use to sign up providers such as Defendants to submit claims electronically. Per the Claims Manual, such an enrollment form must contain, and the enrolling provider must acknowledge, at least the following statements:

> The provider agrees to the following provisions for submitting Medicare claims electronically to CMS or to CMS' A/B MACs or CEDI:
>
> * * *
>
> 7. That it will submit claims that are accurate, complete, and truthful;
>
> * * *
>
> 12. That it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsified or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law; [and]

---

[10] *Available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c24.pdf (last accessed July 10, 2018).

[11] A MAC is a private insurer awarded a geographic jurisdiction to process medical claims for Medicare beneficiaries. MAC jurisdictions can be found at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/Downloads/AB-MAC-Jurisdiction-Map-Oct-2017.pdf (last accessed August 1, 2018). The current MAC for this jurisdiction, in which Defendants practiced, is Noridian Healthcare Solutions, LLC.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

* * *

14. That it will research and correct claim discrepancies[.]

Claims Manual, Chapter 24 § 30.2.

52.    The submission of such a certification, if false, is a violation of the FCA. 31 U.S.C. § 3729(a).

53.    Each such false certification is a separate violation of the FCA.

## C.    The Texas Medicaid Fraud Prevention Act

54.    The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 *et seq.* ("TMFPA") is similar to the FCA but covers claims made to the Texas Health and Human Services Commission (the "THHSC"), which administers the Texas Medicaid program.

55.    The TMFPA establishes liability for any person who:

    (7)    knowingly makes or causes to be made a claim under the Medicaid program for:

* * *

        (B)    a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

        (C)    a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate.

Tex. Hum. Res. Code § 36.002.

56.    "Knowing" is defined by the TMFPA to include "conscious indifference to the truth or falsity of the information" and "reckless disregard of the truth or falsity of the information." *Id.* § 36.0011.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

57.    For each violation of the TMFPA, Texas assesses a substantial civil penalty, plus treble the damages sustained by Medicaid. *Id.* § 36.052.[12]

58.    The TMFPA provides for payment of a percentage of Texas's recovery to a private individual who brings suit on behalf of Texas (the "Relator") under the TMFPA. *Id.* § 36.110.

**D.    The Texas Medicaid Program**

59.    Congress enacted Medicaid under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*

60.    Medicaid is a jointly funded cooperative venture between the federal and state governments to provide health care to certain groups, primarily the poor and the disabled. *See* 42 C.F.R. §§ 430.0 *et seq.*

61.    Under the Medicaid program, the United States, through CMS, pays a specified percentage of each state's Medicaid program expenditures, known as the Federal Medical Assistance Percentage ("FMAP"). *See* 42 U.S.C. § 1396d(b).

62.    In order to enroll as a provider for the THHSC, a healthcare entity must agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to records and information required by the THHSC. In order to receive THHSC funds, enrolled providers in Texas, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all policies and procedures applicable to the THHSC.

63.    At all times relevant herein, Defendants have been enrolled providers for the THHSC. Defendants are eligible to receive reimbursement for services they provide to patients who are insured through the THHSC.

---

[12] The amount of the penalty is determined by whether the fraud "results in [presumably physical] injury to an elderly person, … a person with a disability, … or a person younger than 18 years of age." § 36.052(a)

13

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## COUNT I
## FEDERAL FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS

64.    As described above, Defendant knowingly presented or caused to be presented claims for payment to CMS and/or its MAC for skin graft procedures which were contraindicated and not medically reasonable and necessary. These claims were factually false in that they purported to be for medically necessary services.

65.    The submission of these false claims caused CMS and/or its MAC to pay out monies that they would not have paid if they had known of the falsity of these claims.

66.    CMS and its MAC are grantees or other recipients of money from the United States Government within the meaning of 31 U.S.C. § 3729(b)(2)(A)(ii). All such money is to be spent to advance the United States' interest in the Medicare program.

67.    Accordingly, Defendants' knowing presentations of false or fraudulent claims for payment to CMS and/or its MAC were violations of 31 U.S.C. § 3729(a)(l)(A).

68.    Each presentation of a false or fraudulent claim to CMS and/or its MAC is a separate violation of the FCA.

69.    By reason of the false or fraudulent claims that Defendants knowingly presented, the United States has been damaged in an amount to be proven at trial.

## COUNT II
## FEDERAL FALSE CLAIMS ACT:
## FALSE RECORD OR STATEMENT

70.    As described above, Defendants knowingly made and used false records and statements when they caused claims for payment to be submitted to CMS and/or its MAC, including false statements that skin graft procedures were medically necessary.

14

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

71.    The making and use of these false records or statements caused CMS and/or its MAC to pay out monies that they would not have paid if they had known of the falsity of Defendants' records and statements.

72.    CMS and its MAC are grantees or other recipients of money from the United States Government within the meaning of 31 U.S.C. § 3729(b)(2)(A)(ii). All such money is to be spent to advance the United States' interest in the Medicare program.

73.    Accordingly, Defendants' knowing making and use of false records or statements material to false or fraudulent claims for payment submitted to CMS and/or its MAC were violations of 31 U.S.C. § 3729(a)(l)(B).

74.    Each making or use of a false record or statement to CMS and/or its MAC is a separate violation of the FCA.

75.    By reason of the false or fraudulent records or statements that Defendants knowingly made or used, the United States has been damaged in an amount to be proven at trial.

## COUNT III
## TEXAS MEDICAID FRAUD PREVENTION ACT:
## INAPPROPRIATE SERVICE OR PRODUCT

76.    As alleged above, Defendants knowingly made or caused to be made claims to the THHSC for skin substitutes and surgeries which were substantially inadequately or inappropriate compared to recognized standards in violation of Tex. Hum. Res. Code §§ 36.002(7).

77.    Specifically, Jones performed skin grafts despite contraindications and an abysmal history of patient outcomes. Jones's procedures were substantially inadequate or inappropriate compared to standards established by CMS and practiced by Jones's colleagues, who uniformly mock his malpractice.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

78.     By reason of the claims for inadequate or inappropriate services that Defendants knowingly made, Texas is entitled to recover monies in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator respectfully requests that this Court enter judgment in her favor and that of the United States and Texas and against Defendants, granting the following on all Counts:

(A)     an award to the United States for treble its damages, a statutory penalty for each violation of the FCA, and for its costs pursuant to 31 U.S.C. § 3729(a)(3);

(B)     an award to Texas for treble its damages, a civil penalty for each violation of the TMFPA, and its costs pursuant to Tex. Hum. Res. Code § 36.052;

(C)     an award to Relator in the maximum amount permitted under 31 U.S.C. § 3730(d) and Tex. Hum. Res. Code § 36.110, and for the reasonable attorney's fees and costs she incurred in prosecuting this action;

(D)     awards to the United States, Texas, and Relator for pre- and post-judgment interest at the rates permitted by law; and

(E)     an award of such other and further relief as this Court may deem to be just and proper.

[this space intentionally left blank]

16

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relator demands trial by jury on all questions of fact raised by the Complaint.

Dated: June 23, 2020

Respectfully submitted,

**BROWN, LLC**
**(Lead Counsel)**

By: /s/ Jason T. Brown
Jason T. Brown
    (*pro hac vice* application forthcoming)
Benjamin Lin
    (*pro hac vice* application forthcoming)
Patrick S. Almonrode
    (*pro hac vice* application forthcoming)
(877) 561-0000 (office)
(855) 582-5297 (fax)
*jtb@jtblawgroup.com*
*ben.lin@jtblawgroup.com*
*patalmonrode@jtblawgroup.com*

**DEAN OMAR BRANHAM SHIRLEY,**
**LLP**
**Local Counsel**

*/s/ Charles W. Branham III*
Charles W. Branham III
Attorney-in-Charge
Texas Bar No. 24012323
Federal Bar No. 1098949
302 N. Market Street, Suite 300
Dallas, TX 75202
(214) 722-5990 (office)
(214) 722-5991 (fax)
*tbranham@dobllp.com*

*Attorneys for Relator*

17

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2020, I caused a true copy of the Complaint in the matter captioned *United States of America ex rel. Amber Faulkner v. Methodist Charlton Medical Center, et al.* to be served upon the following, along with written disclosure of substantially all material evidence and information possessed by Relator:

*by USPS Registered Mail, Return Receipt Requested, to*

Erin Nealy Cox
United States Attorney's Office
Northern District of Texas
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

Ken Paxton
Attorney General of Texas
Office of the Attorney General
300 W. 15th Street
Austin, Texas 78701

Office of the Attorney General of the United States
United States Department of Justice
950 Florida Avenue, NW
Washington, DC 20530-0001

_____/s/ Benjamin Lin_____
Benjamin Lin

JS 44   (Rev. 06/17) - TXND (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

The United States of America and the State of Texas ex rel. Amber Faulkner

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Dean Omar Branham Shirley, LLP
302 N. Market Street, Suite 300, Dallas, TX 75202
214-722-5990

## DEFENDANTS

Methodist Charlton Medical Center, and Dan Jones, D.P.M.

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**RECEIVED**

**JUN 23 2020**

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 2   U.S. Government
Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☒ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation -
Transfer

☐ 8   Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. §§ 3729 et seq.
Brief description of cause:
Defendants defrauded Medicare and Medicaid by billing for medically unnecessary procedures.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 06/23/2020 | /s/ Charles W. Branham III |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# EXHIBIT A

# Local Coverage Determination (LCD):
# Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds (L35041)

Links in PDF documents are not guaranteed to work. To follow a web link, please use the MCD Website.

# Contractor Information

| CONTRACTOR NAME | CONTRACT TYPE | CONTRACT NUMBER | JURISDICTION | STATE(S) |
|---|---|---|---|---|
| Novitas Solutions, Inc. | A and B MAC | 04111 - MAC A | J - H | Colorado |
| Novitas Solutions, Inc. | A and B MAC | 04112 - MAC B | J - H | Colorado |
| Novitas Solutions, Inc. | A and B MAC | 04211 - MAC A | J - H | New Mexico |
| Novitas Solutions, Inc. | A and B MAC | 04212 - MAC B | J - H | New Mexico |
| Novitas Solutions, Inc. | A and B MAC | 04311 - MAC A | J - H | Oklahoma |
| Novitas Solutions, Inc. | A and B MAC | 04312 - MAC B | J - H | Oklahoma |
| Novitas Solutions, Inc. | A and B MAC | 04411 - MAC A | J - H | Texas |
| Novitas Solutions, Inc. | A and B MAC | 04412 - MAC B | J - H | Texas |
| Novitas Solutions, Inc. | A and B MAC | 04911 - MAC A | J - H | Colorado New Mexico Oklahoma Texas |
| Novitas Solutions, Inc. | A and B MAC | 07101 - MAC A | J - H | Arkansas |
| Novitas Solutions, Inc. | A and B MAC | 07102 - MAC B | J - H | Arkansas |
| Novitas Solutions, Inc. | A and B MAC | 07201 - MAC A | J - H | Louisiana |
| Novitas Solutions, Inc. | A and B MAC | 07202 - MAC B | J - H | Louisiana |
| Novitas Solutions, Inc. | A and B MAC | 07301 - MAC A | J - H | Mississippi |
| Novitas Solutions, Inc. | A and B MAC | 07302 - MAC B | J - H | Mississippi |
| Novitas Solutions, Inc. | A and B MAC | 12101 - MAC A | J - L | Delaware |
| Novitas Solutions, Inc. | A and B MAC | 12102 - MAC B | J - L | Delaware |
| Novitas Solutions, Inc. | A and B MAC | 12201 - MAC A | J - L | District of Columbia |
| Novitas Solutions, Inc. | A and B MAC | 12202 - MAC B | J - L | District of Columbia |
| Novitas Solutions, Inc. | A and B MAC | 12301 - MAC A | J - L | Maryland |
| Novitas Solutions, Inc. | A and B MAC | 12302 - MAC B | J - L | Maryland |
| Novitas Solutions, Inc. | A and B MAC | 12401 - MAC A | J - L | New Jersey |
| Novitas Solutions, Inc. | A and B MAC | 12402 - MAC B | J - L | New Jersey |
| Novitas Solutions, Inc. | A and B MAC | 12501 - MAC A | J - L | Pennsylvania |

| CONTRACTOR NAME | CONTRACT TYPE | CONTRACT NUMBER | JURISDICTION | STATE(S) |
|---|---|---|---|---|
| Novitas Solutions, Inc. | A and B MAC | 12502 - MAC B | J - L | Pennsylvania |
| Novitas Solutions, Inc. | A and B MAC | 12901 - MAC A | J - L | Delaware<br>District of Columbia<br>Maryland<br>New Jersey<br>Pennsylvania |

# LCD Information

## Document Information

**LCD ID**
L35041

**LCD Title**
Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds

**Proposed LCD in Comment Period**
N/A

**Source Proposed LCD**
N/A

**AMA CPT / ADA CDT / AHA NUBC Copyright Statement**
CPT codes, descriptions and other data only are copyright 2019 American Medical Association. All Rights Reserved. Applicable FARS/HHSARS apply.

Current Dental Terminology © 2019 American Dental Association. All rights reserved.

Copyright © 2019, the American Hospital Association, Chicago, Illinois. Reproduced with permission. No portion of the AHA copyrighted materials contained within this publication may be copied without the express written consent of the AHA. AHA copyrighted materials including the UB-04 codes and descriptions may not be removed, copied, or utilized within any software, product, service, solution or derivative work without the written consent of the AHA. If an entity wishes to utilize any AHA materials, please contact the AHA at 312-893-6816. Making copies or utilizing the

**Original Effective Date**
For services performed on or after 10/01/2015

**Revision Effective Date**
For services performed on or after 09/26/2019

**Revision Ending Date**
N/A

**Retirement Date**
N/A

**Notice Period Start Date**
N/A

**Notice Period End Date**
N/A

Created on 06/19/2020. Page 2 of 22

content of the UB-04 Manual, including the codes and/or descriptions, for internal purposes, resale and/or to be used in any product or publication; creating any modified or derivative work of the UB-04 Manual and/or codes and descriptions; and/or making any commercial use of UB-04 Manual or any portion thereof, including the codes and/or descriptions, is only authorized with an express license from the American Hospital Association. To license the electronic data file of UB-04 Data Specifications, contact Tim Carlson at (312) 893-6816 or Laryssa Marshall at (312) 893-6814. You may also contact us at ub04@healthforum.com.

## CMS National Coverage Policy

This LCD supplements but does not replace, modify or supersede existing Medicare applicable National Coverage Determinations (NCDs) or payment policy rules and regulations for bioengineered skin substitutes. Federal statute and subsequent Medicare regulations regarding provision and payment for medical services are lengthy. They are not repeated in this LCD. Neither Medicare payment policy rules nor this LCD replace, modify or supersede applicable state statutes regarding medical practice or other health practice professions acts, definitions and/or scopes of practice. All providers who report services for Medicare payment must fully understand and follow all existing laws, regulations and rules for Medicare payment for bioengineered skin substitutes and must properly submit only valid claims for them. Please review and understand them and apply the medical necessity provisions in the policy within the context of the manual rules. Relevant CMS manual instructions and policies may be found in the following Internet-Only Manuals (IOMs) published on the CMS Web site:

### IOM Citations:

- CMS IOM Publication 100-03, *Medicare National Coverage Determinations (NCD) Manual*, Chapter 1, Part 4, Section 270.3 Blood-Derived Products for Chronic Non-Healing Wounds
- CMS IOM Publication 100-04, *Medicare Claims Processing Manual*, Chapter 17, Section 40 Discarded Drugs and Biologicals
- CMS IOM Publication 100-08, *Medicare Program Integrity Manual*, Chapter 13, Section 13.5.4 Reasonable and Necessary Provisions in LCDs

### Change Request References:

- CMS Change Request, CR 8213; Autologous Platelet-Rich Plasma (PRP) for Chronic Non-Healing Wounds; issued June 10, 2013.

### Social Security Act (XVIII) Standard References:

- Title XVIII of the Social Security Act, 1862(a)(1)(A) states that no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury.
- Title XVIII of the Social Security Act, Section 1833(e) states that no payment shall be made to any provider for any claim that lacks the necessary information to process the claim.
- Title XVIII of the Social Security Act, Section 1862(a)(7). This section excludes routine physical examinations.

## Coverage Guidance

**Coverage Indications, Limitations, and/or Medical Necessity**

**Notice:** It is not appropriate to bill Medicare for services that are not covered (as described by this entire LCD) as if they are covered. When billing for non-covered services, use the appropriate modifier.

Compliance with the provisions in this policy may be monitored and addressed through post payment data analysis and subsequent medical review audits.

**History/Background and/or General information**

The addition of Skin Substitutes or Cellular or Tissue Based Products (CTPs) to certain wounds may afford a healing advantage over dressings and conservative treatments when these options appear insufficient to affect complete healing.

There are currently a wide variety of bioengineered products available for soft tissue coverage to affect closure. These products may be derived from allogeneic, xenogeneic, synthetic sources or a combination of any or all of these types of materials. However, without the component of the recipient's own distinct epithelium and cellular skin elements, permanent skin replacement or coverage by the graft cannot be accomplished.

**Autologous skin grafts,** also referred to as autografts, are permanent covers that use skin from different parts of the individual's body. These grafts consist of the epidermis and a dermal component of variable thickness. A split-thickness skin graft (STSG) includes the entire epidermis and a portion of the dermis. A full thickness skin graft (FTSG) includes all layers of the skin. Although autografts are the optimal choice for full thickness wound coverage, areas for skin harvesting may be limited, particularly in cases of large burns or venous stasis ulceration. Harvesting procedures are painful, disfiguring and require additional wound care.

**Allografts** which use skin from another human (e.g., cadaver) and **Xenografts** which use skin from another species (e.g., porcine or bovine) may also be employed as temporary skin replacements, but they must later be replaced by an autograft or the ingrowth of the patient's own skin.

**Bioengineered Skin / Cultured Epidermal Autografts (CEA)** are autografts derived from the patient's own skin cells grown or cultured from very small amounts of skin or hair follicle. Production time is prolonged. One such product is grown on a layer of irradiated mouse cells, bestowing some elements of a xenograft. Wide spread usage has not been available due to limited availability or access to the technology.

**Bioengineered Skin Substitutes or Cellular and Tissue Based Products (CTPs), referred to as Skin Substitutes by CMS, The Current Procedural Terminology (CPT) and The Healthcare Common Procedure Coding Manuals**, have been developed in an attempt to circumvent problems inherent with autografts, allografts and xenografts. These constitute biologic covers for refractory wounds with full thickness skin loss secondary to 3rd degree burns or other disease processes such as diabetic neuropathic ulcers and the skin loss of chronic venous stasis or venous hypertension. The production of these biologic skin substitutes or CTPs varies by company and product, but generally involves the creation of immunologically inert biological products containing protein, hormones or enzymes seeded into a matrix which may provide protein or growth factors proposed to stimulate or facilitate healing or promote epithelization. A variety of biosynthetic and tissue-engineered skin substitution products marketed as **Human Skin Equivalents (HSE) or Cellular or Tissue-based Products (CTP)** are manufactured under an array of trade names and marketed for a variety of indications. All are procured, produced, manufactured, processed and promoted in sufficiently different manners to preclude direct product comparison for equivalency or superiority in randomized controlled trials. Sufficient data is available to establish distinct inferiority to human skin autografts and preclude their designation as skin equivalence.

**Bioengineered skin substitutes** or **CTPs** are classified into the following types:

- **Human skin allografts** derived from donated human skin (cadavers)
- **Allogeneic matrices** derived from human tissue (fibroblasts or membrane)
- **Composite matrices** derived from human keratinocytes, fibroblasts and xenogeneic collagen
- **Acellular matrices** derived from xenogeneic collagen or tissue

**Human Skin Allografts** are bioengineered from human skin components and human tissue which have had intact cells removed or treated to avoid immunologic rejection. They are available in different forms promoted to allow scaffolding, soft tissue filling, growth factors and other bioavailable hormonal or enzymatic activity.

**Allogeneic Matrices** are usually derived from human neonatal fibroblasts of the foreskin that may contain metabolically active or regenerative components primarily used for soft tissue support, though some have been approved for the treatment of full-thickness skin and soft tissue loss. Most are biodegradable and disappear after 3-4 weeks implantation.

**Composite Matrices** are derived from human keratinocytes and fibroblasts supported by a scaffold of synthetic mesh or xenogeneic collagen. These are also referred to as human skin equivalent but are unable to be used as autografts due to immunologic rejection or degradation of the living components by the host. Active cellular components continue to generate bioactive compounds and protein that may accelerate wound healing and epithelial regrowth.

**Acellular Matrices** are derived from other than human skin and include the majority of bioengineered skin substitutes. All are composed of allogeneic or xenogeneic derived collagen, membrane, or cellular remnants proposed to simulate or exaggerate the characteristics of human skin. All propose to promote healing by the creation of localized intensification of an array of hormonal and enzymatic activity to accelerate closure by migration of native dermal and epithelial components, rather than function as distinctly incorporated tissue closing the skin defect.

For the purpose of this LCD, consideration is given to the use of dermal or epidermal substitute tissue of human or non-human origin, with or without bioengineered or processed elements, with or without metabolically active elements, with a designated use as coverage for a superficial skin deficit that has persisted, despite optimal wound care for a period of 4 weeks or greater. These products are those referred to as Human Cellular or Tissue Based Products (CTPs) or Skin Substitutes.

Evaluation of the clinical literature indicates that studies comparing the efficacy of bioengineered skin substitute to alternative wound care approaches with patients' autologous skin are limited in number, apply mainly to generally healthy patients, and examine only a small portion of the skin substitute products available in the United States. **Therefore, all products with U.S. Food and Drug Administration (FDA) clearance/approval or designated 361 HCT/P exemption used in accordance with that product's individualized application guidelines will be equally considered for the purpose of this LCD and may be considered reasonable and necessary.**

**Regulatory Status**

**US Food and Drug Administration (FDA) Governing Skin Substitute Products**

The FDA does not refer to any product or class of products as "skin substitutes." However, products commonly described as "skin substitutes" are regulated by FDA under one of the four categories described below depending on the origin and composition of the product and listed as a "Skin Substitute" with a HCPCS code Q41XX.

1. **Human Cells, Tissues, and Cellular and Tissue-Based Products** - Cells and tissues taken from human donors and transplanted to a recipient are regulated under PHS 361 [21 CFR 1270 & 1271]. This regulation describes the rules concerning the use of HCT/Ps for human medical purposes. The final rule, 21 CFR Part 1271, became effective on April 4, 2001, for human tissues intended for transplantation that are regulated

under section 361 of the PHS Act and 21 CFR Part 1270. HCT/Ps are regulated by the Center for Biologics Evaluation and Research (CBER). The Center for Biologics Evaluation and Research is responsible for regulating biological and related products including blood, vaccines, allergenics, tissues, and cellular and gene therapies. Establishments producing HCT/Ps must register with FDA and list their HCT/Ps. HCT/Ps establishments are not required to demonstrate the safety or effectiveness of their products and FDA does not evaluate the safety or effectiveness of these products.

2. **Premarket Approval** - Premarket approval (PMA) by FDA is the required process of scientific review to ensure the safety and effectiveness of Class III devices. Before Class III devices can be marketed, they must have an approved PMA application. Therefore, wound care products regulated under the PMA process will require evidence that they promote wound healing before they are approved for marketing.

3. **510(k) Submissions** - According to FDA documents a "510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent (SE), to a legally marketed device (21 CFR 807.92(a)(3)) that is not subject to PMA." Submitters must compare their device to one or more similar legally marketed devices and make and support their substantial equivalency claims. Unlike PMA, 510(k) confers reasonable assurance of safety and effectiveness via demonstration of substantial equivalence to a legally marketed device that does not require premarket approval. Therefore, wound care products regulated under the 510(k) process will not typically require clinical evidence to establish effectiveness in wound healing, as compared with products regulated under the PMA process in which substantial clinical evidence is always required.

4. **Humanitarian Device Exemption (HDE)** - An HDE is similar in both form and content to a premarket approval (PMA) application, but is exempt from the effectiveness requirements of a PMA. An HDE application is not required to contain the results of scientifically valid clinical investigations demonstrating that the device is effective for its intended purpose. The applicant must demonstrate that no comparable devices are available to treat or diagnose the disease or condition, and that they could not otherwise bring the device to market. Humanitarian Device Exemption approval is based on evidence of probable benefit in a disease population occurring at a frequency of less than 4,000 patients per year in the United States.
   Updated designation and approved usage criteria may be found under Medical Devices/Products and Medical Procedures at: http://www.fda.gov/
   Expanded classification criteria and explanation is included in the HHS/AHRS Final Report, December 18, 2012, entitled *Skin Substitutes for Treating Chronic Wounds.*

Per the American Medical Association and the CPT Manual, *"Skin Replacement Surgery"* or *"Skin Substitute Grafting"* is a conceptual model focusing on the work and services provided regardless of the product used. This removes the requirement for maintenance and education on the use of supply codes that have little impact on the "typical patient" or the provider effort for application of the product. The application of skin substitute (or CTP) is distinguished according to the wound characteristics and surface area rather than by product description. Currently, no product has demonstrated individual superiority for the treatment of diabetic foot ulcers (DFU) and venous leg ulcers (VLU) of the lower extremity, and, frequently such products are utilized inappropriately.

Non-graft wound dressings are generally included in standard wound care management; such products may provide value and, in fact, may preclude the need for skin substitute application.

Standard treatment of chronic lower extremity ulcers or skin loss (e.g., DFU or VLU) primarily includes infection and edema control, mechanical offloading, mechanical compression or limb elevation, debridement of necrotic or infected tissue, and management of concomitant and inciting medical issues (blood glucose control, tobacco use). Maintenance of a therapeutic environment with appropriate dressings to preclude further trauma facilitates development of healthy granulation tissue and encourages re-epithelialization. A wound that fails to show evidence of healing by contraction and advancement of epithelial margins following 4 weeks of optimization, including all aspects of standard therapy, is considered a chronic non-healing wound and falls into the auspices of this LCD. The fundamental basis for non-healing of a wound is of paramount importance and must be corrected prior to consideration of additional therapy.

The depth of skin loss is the determinant of its ability to return. Full thickness skin loss, implying the loss of all elements of the epidermis and dermis, will require re-epithelization of the surface once a clean granular base is established. Both full and partial thickness skin loss may benefit from enhanced products referred to as Skin Substitutes. Though no skin substitutes are capable of replacing the patient's own skin, they have been demonstrated to allow scaffolding for the growth of epithelium, enzymatic cleansing and provision of growth factors beneficial to deficit reduction and re-epithelization.

This document addresses the management of chronic non-healing wounds or skin deficits of the lower extremities with the goal of wound and skin closure when standard or conservative measures have failed. While lower extremity ulcers have numerous causes such as burns, trauma, immobility, ischemia or other neurologic impairment, over 90% of the lesions are related to venous stasis disease and diabetic neuropathy. Therefore, the focus of this policy is the application of bioengineered skin substitute material to diabetic foot ulcers and venous leg ulcers of the lower extremities and the reasonable and necessary (R&N) threshold for utilization of skin substitutes. Particular emphasis is placed on the indications for application of bioengineered skin substitute material for DFU and VLU.

Patients receiving a skin substitute graft must be under the care of a physician licensed by the state with full scope of practice for the treatment of the systemic disease process(es) etiologic for the condition (e.g., venous insufficiency, diabetes, neuropathy). This concurrent medical management and the identity of the managing medical physician shall be clearly discernable in the medical record and available upon request.

Medicare coverage for wound care on a continuing basis, for a single wound, in an individual patient is contingent upon evidence documented in the patient's medical record that the wound is improving in response to the wound care being provided. Since it is neither reasonable nor medically necessary to continue a given type of wound care in the absence of wound improvement, it is expected that the wounds response to treatment will be documented in the medical record at least once every 30 days for each episode of wound treatment and made available to the contractor upon request.

**Documentation of response** requires measurements of the initial ulcer, measurements at the completion of at least four weeks of appropriate wound care and measurements immediately prior to placement and with each subsequent placement of the bioengineered skin substitute or CTP.

**Definitions per CPT:**

**Autografts/tissue cultured autografts:** Include the harvest or application of an autologous skin graft.

**Skin substitute grafts:** Include non-autologous human cellular and tissue products (e.g., dermal or epidermal, cellular and acellular, homograft or allograft), non-human cellular or tissue products (i.e., xenograft), and biological products (synthetic or xenogeneic) that are applied in a sheet over an open wound to augment wound closure or skin growth.

**Covered Indications**

Chronic Wounds are defined as wounds that do not respond to standard wound treatment for at least a 30 day period during organized comprehensive conservative therapy.

For all wounds, documentation (as outlined in the documentation requirements of the policy) and a comprehensive treatment plan, before initiation of a specialized wound therapy product is required.

For purposes of this LCD a **Failed Response** is defined as an ulcer or skin deficit that has failed to respond to documented appropriate wound-care measures, has increased in size or depth, or has not changed in baseline size or depth and has no indication that improvement is likely (such as granulation, epithelialization or progress towards

closing).

Medicare covers application of skin substitutes to Ulcers or Wounds with **Failed Response** that are:

- Partial- or full-thickness ulcers, not involving tendon, muscle, joint capsule or exhibiting exposed bone or sinus tracts, with a clean granular base;
- Skin deficit at least 1.0 square centimeter (cm) in size;
- Clean and free of necrotic debris or exudate;
- Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index [ABI] of no less than 0.60, toe pressure greater than 30 millimeters of mercury [mmHg]);
- For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.

Wound healing is impaired by the systemic use of tobacco. Therefore, ideally patients who have smoked will have ceased smoking or have refrained from systemic tobacco intake for at least 4 weeks during conservative wound care and prior to planned bioengineered skin replacement therapy.

Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed. Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented. Documentation of smoking cessation counseling and cessation measures prescribed, if applicable, must also be documented in the patient's record.

Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:

- Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.
- Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.
- Presence of a full thickness skin loss ulcer that is the result of abscess, injury or trauma that has failed to respond to appropriate control of infection, foreign body, tumor resection, or other disease process for a period of 4 weeks or longer.

In all wound management the ulcer must be free of infection and underlying osteomyelitis with documentation of the conditions that have been treated and resolved prior to the institution of skin substitute therapy. For purposes of this LCD, appropriate therapy includes, but is not limited to:

- Control of edema, venous hypertension or lymphedema
- Control of any nidus of infection or colonization with bacterial or fungal elements
- Elimination of underlying cellulitis, osteomyelitis, foreign body, or malignant process
- Appropriate debridement of necrotic tissue or foreign body (exposed bone or tendon)
- For diabetic foot ulcers, appropriate non-weight bearing or off-loading pressure
- For venous stasis ulcers, compression therapy provided with documented diligent use of multilayer dressings, compression stockings of greater than 20 mmHg pressure, or pneumatic compression
- Provision of wound environment to promote healing (protection from trauma and contaminants, elimination of

inciting or aggravating processes)

**Limitations**

The following are considered not reasonable and necessary and therefore will be denied:

Due to the propensity for misuse of skin substitute and biological dressing products, reimbursement may be made only when the medical record clearly documents that these products have been used in a comprehensive, organized wound management program. **All listed products, unless they are specifically FDA-labeled or cleared for use in the types of wounds being treated, will be considered to be biologic dressings and part of the relevant Evaluation and Management (E/M) service provided and not separately reimbursed.**

- Partial thickness loss with the retention of epithelial appendages is not a candidate for grafting or replacement, as epithelium will repopulate the deficit from the appendages, negating the benefit of overgrafting.
- Skin substitute grafts will be allowed for the episode of wound care in compliance with FDA guidelines for the specific product (see utilization guidelines) not to exceed 10 applications or treatments. In situations where more than one specific product is used, it is expected that the number of applications or treatments will still not exceed 10.
- Simultaneous use of more than one product for the episode of wound is not covered. Product change within the episode of wound is allowed, not to exceed the 10 application limit per wound per 12 week period of care.
- Treatment of any chronic skin wound will typically last no more than twelve (12) weeks.
- Repeat or alternative applications of skin substitute grafts are not considered medically reasonable and necessary when a previous full course of applications was unsuccessful. Unsuccessful treatment is defined as increase in size or depth of an ulcer or no change in baseline size or depth and no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing) for a period of 4 weeks past start of therapy.
- Retreatment of healed ulcers, those showing greater than 75% size reduction and smaller than 0.5 square cm, is not considered medically reasonable and necessary.
- Skin substitute grafts are contraindicated and are not considered reasonable and necessary in patients with inadequate control of underlying conditions or exacerbating factors (e.g., uncontrolled diabetes, active infection, and active Charcot arthropathy of the ulcer extremity, vasculitis or continued tobacco smoking without physician attempt to affect smoking cessation).
- Skin substitute grafts are contraindicated in patients with known hypersensitivity to any component of the specific skin substitute graft (e.g., allergy to avian, bovine, porcine, equine products).
- Repeat use of surgical preparation services in conjunction with skin substitute application codes will be considered not reasonable and necessary. It is expected that each wound will require the use of appropriate wound preparation code at least once at initiation of care prior to placement of the skin substitute graft.
- Re-treatment within one (1) year of any given course of skin substitute treatment for a venous stasis ulcer or (diabetic) neuropathic foot ulcer is considered treatment failure and does not meet reasonable and necessary criteria for re-treatment of that ulcer with a skin substitute procedure.

CMS has guidance regarding other specialized wound treatment technology and specifically addresses platelet rich plasma systems (e.g., Autologet, Magellan); negative pressure wound therapy devices and electro-magnetic/ultrasound/mist therapies. They are not addressed in this LCD as their role in the treatment of the two major types of lower extremity wounds discussed here is limited. For more information on negative pressure wound therapy please see L35125-Wound Care. Utilization remains at the provider's discretion and must be reasonable and necessary. Note that combination therapy with any bioengineered skin substitute (CTP) will be considered not reasonable and necessary.

**Please Note: Autologous Platelet Rich Plasma (PRP) systems used in the treatment of Chronic Non-Healing Wounds is not considered reasonable and necessary except as described in National Coverage**

Determination (NCD) for Blood-Derived Products for Chronic Non-Healing Wounds (270.3). Please refer to the NCD for coverage details.

For frequency limitations please refer to the Utilization Guidelines section below.

**Notice:** This LCD imposes frequency limitations. Services must meet all of the indications and limitations stated in this policy, the general requirements for medical necessity as stated in CMS payment policy manuals, any and all existing CMS national coverage determinations, and all Medicare payment rules.

The redetermination process may be utilized for consideration of services performed outside of the reasonable and necessary requirements in this LCD.

**Summary of Evidence**

N/A

**Analysis of Evidence**
**(Rationale for Determination)**

N/A

# General Information

**Associated Information**

**Documentation Requirements**

1. All documentation must be maintained in the patient's medical record and made available to the contractor upon request.
2. Every page of the record must be legible and include appropriate patient identification information (e.g., complete name, dates of service[s]). The documentation must include the legible signature of the physician or non-physician practitioner responsible for and providing the care to the patient.
3. Medical record documentation must support the medical necessity of the services as stated in this policy.
4. The documentation must support that the service was performed and must be included in the patient's medical record. This information is normally found in the history and physical, office/progress notes, hospital notes, and/or procedure report.
5. The medical record must clearly show that the criteria listed under the Covered Indications and Limitations sections have been met, as well as, the appropriate diagnosis and response to treatment.
6. The documentation must support the need for skin substitute application and the product used.
7. A description of the wound(s) must be documented at baseline (prior to beginning conservative treatment) relative to size, location, stage, duration, and presence of infection, in addition to type of treatment given and response.

- This information must be updated in the medical record throughout treatment.
- Wound description must also be documented pre and post treatment with the skin substitute graft being used.
- If obvious signs of worsening or lack of treatment response is noted, continuing treatment with the skin substitute would not be considered medically reasonable and necessary without documentation of a reasonable rationale for doing so.

8. Documentation of smoking history, and that the patient has received counseling on the effects of smoking on surgical outcomes and treatment for smoking cessation (if applicable) as well as outcome of counselling must be in the medical record.

9. The amount of utilized and wasted skin substitute must be clearly documented in the procedure note with the following minimum information:
   - Date, time and location of ulcer treated;
   - Name of skin substitute and how product supplied;
   - Amount of product unit used;
   - Amount of product unit discarded;
   - Reason for the wastage;
   - Manufacturer's serial/lot/batch or other unit identification number of graft material. When manufacturer does not supply unit identification, record must document such.

**Note:** Novitas expects that where multiple sizes of a specific product are available, the size that best fits the wound with the least amount of wastage will be utilized. Please refer to article A54117 for coding/billing instructions regarding drug wastage.

**Additional Information**

Please see the article A54117, Billing and Coding: Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds, for additional information.

**Utilization Guidelines**

In accordance with CMS Ruling 95-1 (V), utilization of these services should be consistent with locally acceptable standards of practice.

It is the expectation that a specific skin substitute product will be used for the episode of each documented wound, and in compliance with FDA assessments and submitted guidelines for the specific product. Greater than ten (10) applications for the treatment of a single wound within a 12-week period of time will be considered Not Reasonable and Necessary and will be subject to review.

Separately billed repeated use of the skin substitute after 12 weeks for a single wound or episode is non-covered. Alternative or additional skin substitute products used within the 12 week initial wound episode are similarly non-covered when the sum of applications of all Skin Substitutes is greater than ten (10) for a single wound.

The utilization of bioengineered skin substitute non-compliant with medical necessity or designated guidelines for that specific product may necessitate review or non-coverage as not medically necessary.

Labeling for most skin substitute grafts include language suggesting multiple applications; however, Medicare does not expect that every ulcer in every patient will require the maximum number of applications listed on the product label or allowed for reimbursement.

Utilization rates that exceed peer norms, identified through data analysis may prompt prepayment or post payment medical review.

**Sources of Information**

Contractor is not responsible for the continued viability of websites listed.

Other Contractor's Policies

Original JH LCD, L32622, Bioengineered Skin Substitutes.

Original JL ICD-9 Source LCD L27549, Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds

Contractor Medical Directors

**Bibliography**

Note: Some references sources are listed by request of "Skin Substitute" product stakeholders and should not be interpreted as Novitas' endorsement of any specific product.

1. Adetugbo K, Williams H. How well are randomized controlled trials reported in the dermatology literature? *Arch Dermatol*. 2000;136(3):381-385.
2. Agency for Health Care Policy and Research (AHCPR). Panel on the Prediction and Prevention of Pressure Ulcers in Adults. Pressure Ulcers in Adults: Prediction and Prevention. Quick Reference Guide for Clinicians. AHCPR Publication No. 92-0050. Rockville, MD: Agency for Health Care Policy and Research, Public Health Service, U.S. Department of Health and Human Services. May 1992. National Library of Medicine (NLM) [website]. Available at: http://www.ncbi.nlm.nih.gov/bookshelf/br.fcgi? book=hsahcpr&part=A9026#A9026.
3. Agency for Healthcare Research and Quality (AHRQ) Website. Technology Assessment. Negative pressure wound therapy devices. November 12, 2009. Available at: http://www.ahrq.gov.
4. Alexander JH, Yeager DA, Stern DS, et al. Equine Pericardium as a biological covering for the treatment of diabetic foot wounds: A prospective study. *Journal of the American Podiatric Medical Association*. 2012; 102(5):352-357.
5. AlloPatch™ Pliable, Allograft Dermal Matrix package insert. PI-112 Rev1, 01/2015
6. American Medical Association. (2013). *Current Procedural Terminology* (CPT®) Fourth Edition
7. American Society of Plastic Surgeons (ASPS) Website. Evidence based clinical practice guideline: chronic wounds of the lower extremity. May 2007. Available at: http://www.plasticsurgery.org.
8. Association for the Advancement of Wound Care (AAWC) venous ulcer guideline references. Malvern (PA): Association for the Advancement of Wound Care (AAWC); 2010 Dec. 14 p. Electronic copies: Available in Portable Document Format (PDF) from the AAWC Web site.
9. Association for the Advancement of Wound Care (AAWC). Venous ulcer guideline. March 1, 2012. Available at: http://www.aawconline.org.
10. Bello YM, Falabella AF, Eaglstein WH. Tissue-engineered skin. Current status in wound healing. *Am J Clin Dermatol*. 2001;2(5):305-13.
11. Boulton AJ, Kirsner RS, Vileikyte L. Neuropathic diabetic foot ulcers. *N Engl J Med*. 2004; 351(1): 48-55.
12. Brem H, Balledux J, Bloom T, et al. Healing of diabetic foot ulcers and pressure ulcers with human skin equivalent. *Arch Surg*. 2000;135:627-634.
13. Brem H, Balledux J, Sukkarieh T, et al. Healing of venous ulcers of long duration with a bilayered living skin substitute: Results from a general surgery and dermatology department. *Dermatol Surg*. 2001;27:915-919.
14. Brem H, Kirsner RS, MD, Falanga V. Protocol for the successful treatment of venous ulcers. *American Journal of Surgery*. 2004;188(1).
15. Brem H, Sheehan P, Boulton A JM. Protocol for treatment of diabetic foot ulcers. *American Journal of Surgery*. 2004;187:(5).
16. Brem H, Young J, Tomic-Canic M, et al. Clinical efficacy and mechanism of bilayered living human skin

equivalent (HSE) in treatment of diabetic foot ulcers. *Surgical Technology International.* XI:2003; 11:23-31.

17. Budny AM, Ley A, Cryopreserved allograft as an alternative option for closure of diabetic foot ulcers. *Podiatry Management.* 2013: 131-136.

18. Cairns B, Peterson S, Meyer A. Skin replacements. *Arch Surg.* 1993;28.

19. Coerper S, Beckert S, Kuper M, et al. Fifty percent area reduction after 4 weeks of treatment is a reliable indicator for healing – analysis of a single-center cohort of 704 diabetic patients. *Journal of Diabetes and Its Complications.* 2008; 02: 1-5.

20. Curran MP, Plosker GL. Bilayered bioengineered skin substitute (Apligraf®) a review of its use in the treatment of venous leg ulcers and diabetic foot ulcers. *BioDrugs.* 2002;16(6):439-455.

21. DiDomenico L, Emch KJ, Landsman AR, et al. A prospective comparison of diabetic foot ulcers treated with either a cryopreserved skin allograft or a bioengineered skin substitute. *Wounds.* 2011; 23(7): 184-189.

22. Eaglstein W, Falanga V. Tissue engineering and the development of Apligraf, a human skin equivalent. *Clinical Therapeutics.* 1997;19:(5).

23. Edmonds M, Bates M, Doxford M, et al. New treatments in ulcer healing and wound infection. *Diabetes Metab Res* Rev. 2000;(16):S51-4.

24. Elias S. Minimally invasive vein surgery (MIVS) and wound healing: A vascular surgeon's perspective. Supplement to VDM.2007.

25. Falanga V, Margolis D, Alvarez O, et al. Rapid healing of venous ulcers and lack of clinical rejection with an allogenic cultured human skin equivalent. *Arch Dermatol.* 1998;134: 293-300.

26. Falanga V, Sabolinski M. A bilayered living skin construct (APLIGRAF®) accelerates complete closure of hard-to-heal venous ulcers. *Wound Repair and Regeneration.* 1999.

27. Falanga V. How to use Apligraf® to treat venous ulcers. *Skin & Aging.* February 1999.

28. Fetterolf DE and Snyder RJ. Scientific and clinical support for the use of dehydrated amniotic membrane in wound management. *Wounds.* 2012; 24(10): 299-307.

29. Filho JAL, Dadalti P, de Souza DC, et al. Skin grafts in cutaneous oncology. *An Bras Dermatol.* 2006; 5: 465-472.

30. Fivenson DP, Scherschun L, Choucair M, et al. Graftskin therapy in epidermolysis bullosa. *Journal of the American Academy of Dermatology.* 2003;48(6).

31. Fleischli JG, Laughlin TJ, Fleischli JW. Equine pericardium collagen wound dressing in the treatment of the neuropathic diabetic foot wound: A pilot study. *Journal of American Podiatric Medical Association.* 2009; 99(4): 301-305.

32. Fletcher A, Cullum N, Sheldon TA. A systematic review of compression treatment for venous leg ulcers. *BMJ.* 1997;315(7108):576-580.

33. Food and Drug Administration (FDA) [website]. Center for Devices and Radiological Health (CDRH). 510(k) Premarket Notification Database [search: K993948]. SIS Wound Dressing II. January 6, 2000. Available at: http://www.accessdata.fda.gov/cdrh_docs/pdf/k993948.pdf.

34. Food and Drug Administration (FDA) [website]. Center for Devices and Radiological Health (CDRH). 510(k) Premarket Notification Database [search: K014129]. Promogran Matrix Wound Dressing. February 14, 2002. Available at: http://www.accessdata.fda.gov/cdrh_docs/pdf/k014129.pdf.

35. Food and Drug Administration (FDA) [website]. Center for Devices and Radiological Health (CDRH). 510(k) Premarket Notification Database [search: K061407].

36. Food and Drug Administration (FDA) [website]. Center for Devices and Radiological Health (CDRH). 510(k) Premarket Notification Database [search: K061711]. Oasis Wound Matrix. July 19, 2006. Available at http://www.accessdata.fda.gov/cdrh_docs/pdf6/K061711.pdf.

37. Food and Drug Administration (FDA) [website]. Center for Devices and Radiological Health (CDRH). Premarket Approval (PMA) Database [search: H990002]. Epicel® (cultured epidermal autografts) – H990002. October 25, 2007. Available at: http://www.accessdata.fda.gov/cdrh_docs/pdf/H990002a.pdf.

38. Food and Drug Administration (FDA) [website]. Vaccines, Blood & Biologics. GRAFT JACKET Matrix, GRAFT JACKET XPRESS Scaffold and GRAFT JACKET Ulcer Repair Matrix. Updated April 30, 2009.

39. Foti C, Bonamonte D, Conserva A, Angelini G. Allergic contact dermatitis to regenerated oxidized cellulose contained in a matrix employed for wound therapy. *Contact Dermatitis.* 2007; 57(1):47-48.

40. Franz MG, Robson MC, Steed DL, Barbul A, Brem H, Cooper DM, et al. Guidelines to aid healing of acute

wounds by decreasing impediments of healing. *Wound Repair Regen.* 2008;16(6):723-748.

41. Frykberg RG. Diabetic Foot Ulcers: Pathogenesis and management. November 1, 2002. American Academy of Family Physicians (AAFP) [website]. Available at: http://www.aafp.org/afp/2002/1101/p1655.html.

42. Gelfand JM, Hoffstad O, Margolis DJ, Surrogate endpoints for the treatment of venous leg ulcers. *The Journal of Investigative Dermatology.* December 2002; 119(6): 1420-1425.

43. Gentzkow GD, Iwasaki SD, Hershon KS, et al. Use of dermagraft, a cultured human dermis, to treat diabetic foot ulcers. *Diabetes Care.* 1996;19(4):350-354.

44. Genzyme Corporation [website]. Epicel® cultured epidermal autografts (CEA). HDE# 990002. Directions for Use. Revised October 2007. Available at: http://www.genzyme.com/business/biosurgery/burn/epicel_package_insert.pdf

45. Greer N, Foman N, MacDonald R, et al. Advanced wound care therapies for nonhealing diabetic, venous, and arterial ulcers. *Annals of Internal Medicine.* 2013; 159(8), 532-542.

46. Hanft J, Surprenant MS. Healing of chronic foot ulcers in diabetic patients treated with a human fibroblast-derived dermis. *J Foot & Ankle Surgery.* 2002;41(5):291-299.

47. Harding KG, Morris HL, Patel GK. Science, medicine and the future: healing chronic wounds. *BMJ.* 2002;324(7330):160-163.

48. Haugh AM, Witt JG, Hauch A, et al. Amnion membrane in diabetic foot wounds: A meta-analysis. *Plast Reconstr Surg Glob Open.* 2017;5: eI302. Doi: 10.1097/GOX.0000000000001302

49. Hayes, Winifred S. Directory Report. Biological tissue-engineered skin substitutes for wound healing. January 17, 2013. Available at: http://www.hayesinc.com.

50. Hayes, Winifred S. Directory Report. Biosynthetic tissue-engineered skin substitutes for wound healing. February 21, 2012. Available at: http://www.hayesinc.com.

51. Hayes, Winifred S. Health Technology Brief. Oasis® wound matrix (Cook Biotech Inc.) for lower extremity ulcers. December 19, 2011. Available at: http://www.hayesinc.com.

52. Hayes, Winifred S. Search and Summary. FlexHD® Acellular Hydrated Dermis (Ethicon Inc.). March 13, 2012. Available at: http://www.hayesinc.com.

53. Hayes, Winifred S. Search and Summary. Grafix® (Osiris Therapeutics Inc.) living skin substitute allograft. July 6, 2011. Available at: http://www.hayesinc.com.

54. Hayes, Winifred S. Search and Summary. Matristem® wound care matrix (ACell Inc.). October 25, 2011. Available at: http://www.hayesinc.com.

55. Institute for Clinical Systems Improvement Website. Health Care Protocol: Pressure ulcer prevention and treatment protocol. January 2012. Available at: http://www.icsi.org.

56. Jimenez PA, Jimenez SE. Tissue and cellular approaches to wound repair. *American Journal of Surgery.* 2004;187:(5).

57. Johnson & Johnson. Johnson & Johnson Wound Management Announces Novel ORC/Collagen Matrix Dressing for Chronic Wounds [press release]. April 30, 2009.

58. Jones I, Currie L, Martin R. A guide to biological skin substitutes. *Br J Plast Surg.* 2002;55(3):185-193.

59. Jones JE, Nelson EA, Al-Hity A. Skin grafting for venous leg ulcers (Review). *The Cochrane Collaboration.* 2013; 1: 1-62.

60. Kakagia DD, Kazakos KJ, Xarchas KC, et al. Synergistic action of protease-modulating matrix and autologous growth factors in healing of diabetic foot ulcers. A prospective randomized trial. *J Diabetes Complications.* 2007;21(6):387-391.

61. Karr JC. Retrospective comparison of diabetic foot ulcer and venous stasis ulcer healing outcome between a dermal repair scaffold (PriMatrix) and a bilayered living cell therapy (Apligraf). *Advances in Skin & Wound Care.* 2011; 24(3): 119-125.

62. Kavros SJ. Acellular fetal bovine dermal matrix for treatment of chronic ulcerations of the midfoot associated with charcot neuroarthropathy. *Foot & Ankle Specialist.* 2012; 5(4): 230-234.

63. Kavros SJ, Dutra T, Gonzalez-Cruz R, et al. The use of Primatrix, a fetal bovine acellular dermal matrix, in healing chronic diabetic foot ulcers: A prospective multicenter study. *Advances in Skin & Wound Care.* 2014; 27(8): 356-362.

64. Kimmel HM, Robin AL. An evidence-based algorithm for treating venous leg ulcers utilizing the Cochrane Database of Systematic Reviews. *Wounds.* 2013; 25(9): 242-250.

65. Kirsner R, Falanga V, Fivenson D, et al. Clinical experience with a human skin equivalent for the treatment of venous leg ulcers: Process and outcomes. *Wounds.* 1999.

66. Landsman AS, Cook J, Cook E, et al. A retrospective clinical study of 188 consecutive patients to examine the effectiveness of a biologically active cryopreserved human skin allograft (Theraskin) on the treatment of diabetic foot ulcers and venous leg ulcers. *Foot & Ankle Spec.* December 2010: 1-13.

67. Li W, Dasgeb B, Phillips T, et al. Wound-healing perspectives. *Dermatologic Clinics.* 2005;23:(2).

68. Lionelli GT, Lawrence T. Wound dressings. *Surgical Clinics of North America.* 2003;(83).

69. Litwiniuk M, Grzela T. Amniotic membrane: New concepts for an old dressing. *Wound Rep Reg.* 2014; 22:451-456.

70. Lullove E. Acellular fetal bovine dermal matrix in the treatment of nonhealing wounds in patients with complex comorbidities. *Journal of the American Podiatric Medical Association.* 2012; 102(3): 233-239.

71. Marcus B. Treatment of large, complex, non-healing wounds with cryopreserved amniotic suspension allograft: a case series. *J Wound Care, N Am Suppl.* 2016; 25(10): S18-S24.

72. Margolis DJ, Kantor J, Berlin JA. Healing of diabetic neuropathic foot ulcers receiving standard treatment. *Diabetes Care.* 1999;22:692-695.

73. Margolis DJ, Hoffstad O, Gelfand J, et al. Surrogate end points for the treatment of diabetic neuropathic foot ulcers. *Diabetes Care.* 2003;26(6):1696-1700.

74. Marston WA, Hanft J, Norwood P, et al. The efficacy and safety of dermagraft in improving the healing of chronic diabetic foot ulcers. *Diabetes Care.* 2003;26(6):1701-1705.

75. MD Consult Website. Leong M, Phillips L. Wound dressings. In: Townsend Jr. A, Beauchamp R, Evers B, et al, eds. Townsend: Sabiston Textbook of Surgery, 19th ed. Philadelphia, PA: Elsevier; 2012. Available at: http://www.mdconsult.com.

76. Medicare's National Level II Codes HCPCS 2000, American Medical Association.

77. Milliman Care Guidelines® 15th Edition. Skin substitute, tissue-engineered. Available at: http://www.cgi.careguidelines.com/login-careweb.htm.

78. Mostow EN, Haraway GD, Dalsing M, et al. OASIS Venous Ulcer Study Group. Effectiveness of an extracellular matrix graft (OASIS Wound Matrix) in the treatment of chronic leg ulcers: a randomized clinical trial. *J Vasc Surg.* 2005;41(5):837-843.

79. Mostow EN, Wound healing: A multidisciplinary approach for dermatologists. *Dermatologic Clinics.* 2003;21(2).

80. National Guideline Clearinghouse. (2010). Association for the Advancement of Wound Care (AAWC) venous ulcer guideline. *Agency for Healthcare Research and Quality.* Retrieved from http://www.guideline.gov/content.aspx?id=36081&search=wound+care

81. National Guideline Clearinghouse. (2010). Management of chronic venous leg ulcers: A national clinical guideline. *Agency for Healthcare Research and Quality.* Retrieved from http://www.guideline.gov/content.aspx?id=24126&search=wound+care

82. Nemecek GM, Dayan AD. Safety evaluation of human living skin equivalents. *Toxicol Pathol.* 1999;27(1):101-103.

83. Netscher DT, Clamon J. Smoking: adverse effects on outcomes for plastic surgical patients. *Plast Surg Nurs.* 1994;14(4):205-10.

84. Niezgoda JA, Van Gils CC, Frykberg RG, Hodde JP. Randomized clinical trial comparing OASIS wound matrix to Regranex Gel for diabetic ulcers. *Adv Skin Wound Care.* 2005;18(5 Pt 1):258-266.

85. O'Donnell Jr. TF, Passman MA, Marston WA, et al. Management of venous leg ulcers: Clinical practice guidelines of the Society for Vascular Surgery® and the American Venous Forum. *J Vasc Surg.* 2014; 60: 3S-59S.

86. Olin JW, Beusterien KM, Childs MB, Seavey C, McHugh L, Griffiths RI. Medical costs of treating venous stasis ulcers: evidence from a retrospective cohort study. *Vasc Med.* 1999;4(1):1-7.

87. Organogenesis, Inc. Apligraf®. Prescribing Information. Revised April 2006. Available at: http://www.apligraf.com/professional/pdf/prescribing_information.pdf.

88. Pham HT, Rosenblum BI, Lyons TE, et al. Evaluation of a human skin equivalent for the treatment of diabetic foot ulcers in a prospective, randomized, clinical trial. *Wounds.* 1999;11(4):79-86.

89. Phillips TJ. New skin for old: developments in biological skin substitutes. *Arch Dermatol.* 1998;134(3):344-349.

90. Phillips TJ, Machado F, Trout R, et al. Prognostic indicators in venous ulcers. *J Am Acad Dermatol.*

2000;43(4):627-630.

91. Pittet D, Wyssa B, Herter-Clavel C, Kursteiner K, Vaucher J, Lew PD. Outcome of diabetic foot infections treated conservatively: a retrospective cohort study with long-term follow-up. *Arch Intern Med.* 1999;159(8):851-856.

92. PriMatrix Dermal Repair Scaffold. June 29, 2006. Available at: http://www.accessdata.fda.gov/cdrh_docs/pdf6/K061407.pdf.

93. Robson MC, Barbul A. Guidelines for the best care of chronic wounds. *Wound Repair Regen.* 2006;14(6):647-648.

94. Robson MC, Cooper DM, Aslam R, et al. Guidelines for the treatment of venous ulcers. *Wound Repair Regen.* 2006;14(6):649-662.

95. Romanelli M, Dini V, Bertone M, Barbanera S, Brilli C. OASIS wound matrix versus Hyaloskin in the treatment of difficult-to-heal wounds of mixed arterial/venous aetiology. *Int Wound J.* 2007;4(1):3-7.

96. Romanelli M, Kaha E, Stege H, et al. Effect of amelogenin extracellular matrix protein and compression on hard-to-heal venous leg ulcers: follow-up data. *J Wound Care.* 2008;17(1):17-23.

97. Rossi M, Carpi A, Di Maria C, et al. Absent post-ischemic increase of blood flowmotion in the cutaneous microcirculation of healthy chronic cigarette smokers. *Clinical Hemorheology and Microcirculation.* 2007; 36: 163-171.

98. Sanders L, Landsman AS, Landsman A, et al. A prospective, multicenter, randomized, controlled clinical trial comparing a bioengineered skin substitute to a human skin allograft. *Ostomy Wound Management.* 2014; 60(9): 1-8.

99. Serena TE, Carter MJ, Le LT, et al. A multi-center randomized controlled clinical trial evaluating the use of dehydrated human amnion/chorion membrane allografts and multi-layer compression therapy vs. multi-layer compression therapy alone in the treatment of venous leg ulcers. *Wound Rep and Regen.* 2014; 22(6): 1-27.

100. Shafritz R. Combining bilayered living cell therapy with minimally invasive vein surgery: current treatment strategies for venous ulcers. supplement to VDM.2007.

101. Sheehan P, Jones P, Caselli A, et al. Percent change in wound area of diabetic foot ulcers over a 4-week period is a robust predictor of complete healing in a 12-week prospective trial. *Diabetes Care.* 2003; 26(6): 1879-1882.

102. Shores JT, Hiersche M, Gabriel A, et al. Tendon coverage using an artificial skin substitute. *Journal of Plastic, Reconstructive & Aesthetic Surgery.* 2012; 65: 1544-1550.

103. Silverstein P. Smoking and wound healing. *Am J Med.* 1992;93(1A):22S-24S.

104. Snyder DL, Sullivan N, Schoelles KM. Skin Substitutes for Treating Chronic Sounds, Technology Assessment Report, Project ID: HCPRO610, Final Report, December 18,2012. ECRI Institute (EPC) under contract to the Agency for Healthcare Research and Quality (AHRQ), Rockville MD (Contract Number:HHSA 290-2007-10063).

105. Snyder, RJ, Kirsner RS, Warriner, III RA, et al. Consensus recommendations on advancing the standard of care for treating neuropathic foot ulcers in patients with diabetes. *Ostomy Wound Management.* 2010; 56(suppl 4): S1-S24.

106. Sørensen LT, Zillme R, Agren M, Ladelund S, Karlsmark T, Gottrup F. Effect of smoking, abstention, and nicotine patch on epidermal healing and collagenase in skin transudate. *Wound Repair Regen.* 2009;17(3):347-53. doi: 10.1111/j.1524-475X.2009.00479.x.

107. Steed DL, Attinger C, Colaizzi T, Crossland M, Franz M, Harkless L, et al. Guidelines for the treatment of diabetic ulcers. *Wound Repair Regen.* 2006;14(6):680-692.

108. Strauss NH, Brietstein RJ. *Wounds.* 2012; 24(11): 327-334.

109. TEI Biosciences [website]. Primatrix™ Dermal Repair Scaffold. Product Summary. 2008.

110. TheraSkin package insert

111. U.S. Food and Drug Administration (FDA), Center for Devices and Radiological Health (CDRH). Epicel (cultured epidermal autografts). Humanitarian Device Exemption No. H990002. Rockville, MD: FDA;Oct 25, 2007.

112. U.S. Food and Drug Administration (FDA). Bilayer Matrix Wound Dressing. 510(k) Summary. K021792. Integra LifeSciences Corp, Plainsboro, NJ. Rockville, MD: FDA; August 14, 2002. Available at: http://www.fda.gov/cdrh/pdf2/k021792.pdf.

113. UpToDate® Website. Management of diabetic foot lesions. January 2012. Available at: https://www.uptodate.com/home/index.html.

114. US Dept. of Health and Human Services Food and Drug Administration (CDER, CBER, CDRH). Guidance for Industry Chronic Cutaneous Ulcer and Burn Wounds – Developing Products for Treatment. June 2006.

115. Veves A, Falanga V, Armstrong DG, et al. Graftskin, a human skin equivalent, is effective in the management of noninfected neuropathic diabetic foot ulcers. *Diabetes Care*. 2011; 24(2):290-295.

116. Veves A, Sheehan P, Pham HT. A randomized, controlled trial of Promogran (a collagen/oxidized regenerated cellulose dressing) vs standard treatment in the management of diabetic foot ulcers. *Arch Surg*. 2002;137(7):822-827.

117. Vowden P, Romanelli M, Peter R, Boström A, Josefsson A, Stege H. The effect of amelogenins (Xelma) on hard-to-heal venous leg ulcers. *Wound Repair Regen*. 2006;14(3):240-246.

118. Vowden P, Romanelli M, Price P. Effect of amelogenin extracellular matrix protein and compression on hard-to-heal venous leg ulcers. *J Wound Care*. 2007;16(5):189-195.

119. Wallenstein S, Brem H, MD, Statistical analysis of wound-healing rates for pressure ulcers. *American Journal of Surgery*. 2004;188(1).

120. Warriner RA 3rd, Cardinal M; TIDE Investigators. Human fibroblast-derived dermal substitute: results from a treatment investigational device exemption (TIDE) study in diabetic foot ulcers. *Adv Skin Wound Care*. 2011;24(7):306-11.

121. Waugh HV, Sherratt JA. Modeling the effects of treating diabetic wounds with engineered skin substitutes. *Wound Repair Regen*. 2007;15(4):556-65.

122. Wilson TC, Wilson JA, Crim B, et al. The use of cryopreserved human skin allograft for the treatment of wounds with exposed muscle, tendon, and bone. *Wounds*. 2016;28(4):119-125.

123. Winters CL, Brigido SA, Liden BA, Simmons M, Hartman JF, Wright ML. A multicenter study involving the use of a human acellular dermal regenerative tissue matrix for the treatment of diabetic lower extremity wounds. *Adv Skin Wound Care*. 2008;21(8):375-381.

124. Wolcott RD, Cox S. More effective cell-based therapy through biofilm suppression. *Journal of Wound Care*. January 2013; 22(1): 1-6.

125. Wollina U, Schmidt WD, Krönert C, Nelskamp C, Scheibe A, Fassler D. Some effects of a topical collagen-based matrix on the microcirculation and wound healing in patients with chronic venous leg ulcers: preliminary observations. *Int J Low Extrem Wounds*. 2005;4(4):214-224.

126. Zelen CM, Gould L, Serena TE, et al. A prospective, randomised, controlled, multi-centre comparative effectiveness study of healing using dehydrated human amnion/chorion membrane allograft, bioengineered skin substitute, or standard of care for treatment of chronic diabetic lower extremity ulcers. *International Wound Journal*. 2014; 12(6): 1-7.

127. Zelen CM, Orgill DP, Serena T, et al. A prospective, randomized, controlled, multicentre clinical trial examining healing rates, safety and cost to closure of an acellular reticular allogenic human dermis versus standard of care in the treatment of chronic diabetic foot ulcers. *International Wound Journal*. 2016; 14(2): 1-9.

128. Zimny S, Schatz H, Pfohl M. Determinants and estimation of healing times in diabetic foot ulcers. *J Diabetes and Its Complications*. 2002;16:327-332.

# Revision History Information

| REVISION HISTORY DATE | REVISION HISTORY NUMBER | REVISION HISTORY EXPLANATION | REASON(S) FOR CHANGE |
|---|---|---|---|
| 09/26/2019 | R19 | LCD revised and updated 09/26/2019 to completely remove the Coding information section from this LCD per CMS Change Request 10901. Please see the related Billing and Coding Article A54117 for all codes and information related to coding and billing. The following has been removed from the Documentation | • Other (CMS Change Request 10901) |

| REVISION HISTORY DATE | REVISION HISTORY NUMBER | REVISION HISTORY EXPLANATION | REASON(S) FOR CHANGE |
|---|---|---|---|
| | | Requirements: The submitted medical record must support the use of the selected ICD-10-CM code(s). The submitted CPT/HCPCS code must describe the service performed. | |
| 03/21/2019 | R18 | LCD revised and published on 03/21/2019 to remove all CPT/HCPCS codes, ICD-10-CM codes and IOM language per CMS Change Request 10901. All codes have been placed in Local Coverage Article, A54117, Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds. Grammatical changes made for consistency. There has been no change in content to the LCD. | • Other (CMS Requirement and Grammatical Change) |
| 01/01/2019 | R17 | LCD revised and published on 02/14/2019 effective for dates of service on and after 01/01/2019 to reflect the annual CPT/HCPCS code updates. The following CPT/HCPCS code(s) have been deleted and therefore removed from the LCD: Q4131 and Q4172. The following CPT/HCPCS code(s) have been added to Group 2 Codes: Q4186, Q4190, Q4195 and Q4196. For the following CPT/HCPCS code(s) either the short description and/or the long description was changed. Depending on which description is used in this LCD, there may not be any change in how the code displays in the document: Q4133 and Q4137. The text in the policy has been updated to reflect the 2019 CPT/HCPCS Updates. Added a hyperlink to fda.gov in the "Regulatory Status" section of the LCD. CMS IOM language has been removed from the LCD per Change Request 10901. | • Revisions Due To CPT/HCPCS Code Changes<br>• Other (CMS Requirement) |
| 09/17/2018 | R16 | LCD revised and published on 11/08/2018 effective for dates of service on and after 09/17/2018 to add the following code to CPT/HCPCS Code Group 2: Q4180.<br><br>Documentation Requirement #4 and Sources sections updated with standard policy formatting.<br><br>At this time 21st Century Cures Act will apply to new and revised LCDs that restrict coverage which requires comment and notice. This revision is not a restriction to the coverage determination; therefore, not all the fields included on the LCD are applicable as noted in this policy. | • Other (Inquiry and Clarification) |
| 09/13/2018 | R15 | LCD revised and published on 09/13/2018 to add a source from a reconsideration request for Floweramnioflo (HCPCS code Q4177) and a source from a reconsideration request for the use of TheraSkin (HCPCS code Q4121) over exposed wounds. The | • Reconsideration Request |

| REVISION HISTORY DATE | REVISION HISTORY NUMBER | REVISION HISTORY EXPLANATION | REASON(S) FOR CHANGE |
|---|---|---|---|
| | | content of this policy has not been changed in response to either reconsideration request.<br><br>At this time 21st Century Cures Act will apply to new and revised LCDs that restrict coverage which requires comment and notice. This revision is not a restriction to the coverage determination; therefore, not all the fields included on the LCD are applicable as noted in this policy. | |
| 07/26/2018 | R14 | LCD revised and published on 07/26/2018 to add HCPCS code Q4178 to CPT/HCPCS Code Group 2 effective for dates of service on and after 04/09/2018. Literature submitted with this reconsideration request has been reviewed and added to the policy.<br><br>At this time 21st Century Cures Act will apply to new and revised LCDs that restrict coverage which requires comment and notice. This revision is not a restriction to the coverage determination; therefore, not all the fields included on the LCD are applicable as noted in this policy. | • Reconsideration Request |
| 05/10/2018 | R13 | LCD revised and published on 05/10/2018 to update the IOM titles and add a reference to L35125-Wound Care for negative pressure wound therapy and a link to L35125-Wound Care in the Related Local Coverage Documents section per the annual review. | • Other (Annual Review) |
| 01/01/2018 | R12 | LCD revised and published on 01/25/2018 effective for dates of service on and after 01/01/2018 to reflect the annual CPT/HCPCS code updates. For the following CPT/HCPCS codes either the short description and/or the long description was changed: Q4132, Q4133, Q4148, Q4156, Q4158, Q4163. Depending on which description is used in this LCD there may not be any change in how the codes display in the document.<br><br>At this time 21st Century Cures Act will apply to new and revised LCDs that restrict coverage which requires comment and notice. This revision is not a restriction to the coverage determination; therefore, not all the fields included on the LCD are applicable as noted in this policy. | • Revisions Due To CPT/HCPCS Code Changes |
| 05/05/2017 | R11 | LCD revised and published on 07/13/2017 effective for dates of service on and after 05/05/2017 to add the following CPT/HCPCS code to Group 2: Q4169. At this time 21st Century Cures Act will | • Reconsideration Request |

| REVISION HISTORY DATE | REVISION HISTORY NUMBER | REVISION HISTORY EXPLANATION | REASON(S) FOR CHANGE |
|---|---|---|---|
| | | apply to new and revised LCDs that restrict coverage which requires comment and notice. This revision is not a restriction to the coverage determination; and, therefore not all the fields included on the LCD are applicable as noted in this policy. | |
| 01/01/2017 | R10 | LCD revised and published on 05/11/2017 effective for dates of service on and after 01/01/2017 to add the following CPT/HCPCS to Group 2: Q4173 and Q4175. | • Reconsideration Request |
| 01/01/2017 | R9 | LCD revised and published on 01/12/2017 effective for dates of service on and after 01/01/2017 to reflect the annual CPT/HCPCS code updates. The following CPT/HCPCS codes: C9349, Q4119, Q4120, and Q4129 have been deleted and therefore removed from group 2 of the LCD. The following CPT/HCPCS codes: Q4166 and Q4172 have been added to group 2 of the LCD. For the following CPT/HCPCS codes either the short description and/or the long description was changed. Depending on which description is used in this LCD, there may not be any change in how the code displays in the document: Q4105 and Q4131. | • Revisions Due To CPT/HCPCS Code Changes |
| 09/08/2016 | R8 | LCD revised and published on 09/08/2016 to add one source from a reconsideration request. The content of this policy has not been changed in response to the reconsideration request. The hyperlink to NCD 270.3 has been added to the bottom of this LCD. | • Reconsideration Request |
| 04/18/2016 | R7 | LCD revised and published on 07/14/2016 effective for dates of service on and after 04/18/2016 to add HCPCS code Q4128 to the Group 2 codes and to add sources submitted with this reconsideration request. | • Reconsideration Request |
| 01/01/2016 | R6 | LCD revised and published on 01/28/2016 effective for dates of service on and after 01/01/2016 to reflect the annual CPT/HCPCS code updates. The following CPT/HCPCS codes have been added to Group 2: Q4161, Q4163, Q4164, and Q4165. For the following CPT/HCPCS code, either the short description and/or the long description was changed. Depending on which description is used in this LCD, there may not be any change in how the code displays in the document: Q4153. | • Revisions Due To CPT/HCPCS Code Changes |
| 10/01/2015 | R5 | LCD revised and published on 8/13/2015 to add sources that were submitted with a reconsideration request. No other changes have been made to the content of the policy in | • Reconsideration Request |

| REVISION HISTORY DATE | REVISION HISTORY NUMBER | REVISION HISTORY EXPLANATION | REASON(S) FOR CHANGE |
|---|---|---|---|
| | | response to the request . | |
| 10/01/2015 | R4 | The following CPT/HCPCS code descriptor was changed. C9349 descriptor was changed in Group 2 | • Revisions Due To CPT/HCPCS Code Changes |
| 10/01/2015 | R3 | LCD revised and published on 6/25/2015 to add HCPCS codes Q4146 and Q4147 to the Group 2 CPT/HCPCS codes. | • Other (External Inquiry ) |
| 10/01/2015 | R2 | LCD revised and published to provide clarification regarding tobacco use and the use of different products within the same episode of care. Sources updated to include an Article that was submitted with a reconsideration request. No other changes made to the policy in response to the reconsideration request. | • Reconsideration Request<br>• Other (Inquiry ) |
| 10/01/2015 | R1 | LCD revised and published on 04/09/2015 to create uniform LCD with other MAC jurisdiction. | • Creation of Uniform LCDs With Other MAC Jurisdiction |

# Associated Documents

**Attachments**

N/A

**Related Local Coverage Documents**

Article(s)

A54117 - Billing and Coding: Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds

LCD(s)

L35125 - Wound Care

**Related National Coverage Documents**

NCD(s)

270.3 - Blood-Derived Products for Chronic Non-Healing Wounds

**Public Version(s)**

Updated on 09/20/2019 with effective dates 09/26/2019 - N/A

Updated on 03/15/2019 with effective dates 03/21/2019 - 09/25/2019

Some older versions have been archived. Please visit the MCD Archive Site to retrieve them.

# Keywords

Created on 06/19/2020. Page 21 of 22